IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| ROGER HOEGER, | No. 14-cv-1029-JSS |
| Plaintiff, | |
| v. | **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| DUBUQUE RACING ASSOCIATION, LTD, d/b/a MYSTIQUE, | |
| Defendant. | |
| MARY HOEGER, | No. 14-cv-1030-JSS |
| Plaintiff, | |
| v. | **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| DUBUQUE RACING ASSOCIATION, LTD, d/b/a MYSTIQUE, | |
| Defendant. | |

## **TABLE OF CONTENTS**

I.     **INTRODUCTION**.................................................................................................**3**

II.    **RELEVANT FACTUAL BACKGROUND**.........................................................**3**

III.   **ANALYSIS** ........................................................................................................**3**

   A.    **Because the Hoegers' defamation claims are unsupported by any proof of damage and the alleged defamatory statements do not meet the legal definition of defamation, are true, and are subject to qualified privilege, their claims fail as a matter of law.**...................................**4**

      1.    **The barrment letters contain no defamatory content, which defeats the Hoegers' claims.** ........................................................................**4**

      2.    **Because the statements in the barrment letters were substantially true, the Hoegers' defamation claims fail.** ...............................................**12**

1

3.     The statutory privilege that gives gaming operations the right to bar individuals "for any reason" gives Mystique qualified immunity to the Hoegers' claims. ............................................................15

B.     The Hoegers' breach of contract claims fail because they cannot prove Mystique breached the separation agreements and cannot prove any damages...............................................................................................17

1.     The barrment letters are not "disparaging" comments or otherwise detrimental to the Hoegers' reputation.....................................17

2.     Absent proof of damages, the Hoegers cannot prevail on a breach of contract claim. .....................................................................19

C.     The Hoegers' intentional infliction of emotional distress claims fail because issuing lawful barrment letters is not outrageous conduct under Iowa law. ...............................................................................20

2

## I. Introduction

Plaintiffs Mary and Roger Hoeger ("Hoegers") were each employed by Defendant Dubuque Racing Association, Ltd, which does business as Mystique, until their employment ended on or about October 22, 2012 after an investigation revealed that they had engaged in inappropriate and retaliatory conduct in the workplace. The Hoegers each entered in a Confidential Separation Agreement and Release. The Agreements contain identical anti-disparagement clauses. Subsequently, based on employee fears of retaliatory conduct by the Hoegers, Mystique issued barrment letters to them barring them from Mystique. The Hoegers filed this action alleging that the issuance of the barrment letters breached the anti-disparagement clauses of the Agreements, defamed them, and intentionally inflicted emotional distress. For the reasons stated herein, the Hoegers' claims fail as a matter of law and should be dismissed with prejudice.

## II. Relevant Factual Background

Mystique incorporates its Statement of Facts in Support of Motion for Summary Judgment filed herewith as if fully set forth herein.

## III. Analysis

The Hoegers plead three identical claims in their removed petitions. Each claim arises out of the issuance of the barrment letter. First, the Hoegers allege that Mystique breached the Separation Agreements—specifically, the anti-defamation clauses—when it issued the barrment letters. Second, the Hoegers allege that Mystique defamed them when it issued the barrment letters. Third, the Hoegers allege that Mystique intentionally

inflicted emotional distress on them when it issued the barrment letters. Each claim is examined separately below and fails on the law and the facts.

**A. Because the Hoegers' defamation claims are unsupported by any proof of damage and the alleged defamatory statements do not meet the legal definition of defamation, are true, and are subject to qualified privilege, their claims fail as a matter of law.**

The Hoegers point to the barrment letters as the operative alleged defamatory statement at issue in this case, which excluded them from Mystique and stated that the Hoegers' "actions give reason[] to believe that your continued presence could hinder the efficient and expedient methodology of conducting gaming business and operations." App. 52 (R. Hoeger Dep. 59:16-60:6); App. 93 (M. Hoeger Dep. Ex. 3); App. 47 (R. Hoeger Dep. 37:12-19); App. 95 (R. Hoeger Dep. Ex. 5).

It's appropriate to dismiss the Hoegers' defamation claims because the barrment letters do not qualify as "defamatory" since the Hoegers have no evidence that their reputation changed because of the barrment letters. Additionally, the Hoegers' defamation claims fail because the barrment letters contained true statements and are subject to qualified privilege.

**1. The barrment letters contain no defamatory content, which defeats the Hoegers' claims.**

The statements at issue in the barrment letter fail to meet the definition of a defamatory statement under Iowa law. "'Defamation includes the twin torts of libel and slander. Libel involves written statements, while slander involves oral statements.'" *Bierman v. Weier*, 826 N.W.2d 436, 444 (Iowa 2013) (quoting *Kiseau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004)). "The gist of defamation is the publication of . . . statements which tend to injure a person's reputation and good name." *Huegerich v. IBP,*

*Inc.*, 547 N.W.2d 216, 221 (Iowa 1996) (citation omitted). "Ordinarily, a plaintiff must prove that defamatory statements were false, made with malice, and caused damage." *Id.* (citation omitted).

> ### a.    The Hoegers have no evidence of any injury to their reputations due to the barrment letters, defeating their defamation claims.

To prevail on their defamation claims, the Hoegers must prove damage to their reputations. *See Bierman*, 826 N.W.2d at 447. This they cannot do. "'[A] plaintiff must ordinarily prove some sort of cognizable injury, such as injury to reputation.'" *Kiesau*, 686 N.W.2d at 175 (Iowa 2004) (quoting *Johnson*, 542 N.W.2d at 513). "'The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation.'" *Kiesau*, 686 N.W.2d at 174-175 (quoting *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998)). "'Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in his reputation and good name.'" *Id.* at 175 (quoting *Schlegel*, 585 N.W.2d at 221).

At their depositions and in their written discovery responses, the Hoegers failed to identify a single person whose opinion of them had changed as a result of the barrment letter. *See* Statement of Facts ¶ 80-82, 85. They both admitted that no one took any action on the gaming licenses they held following the barrment—they expired at the end of the year due to non-renewal. *See* Statement of Facts ¶ 92, 94, 98. Although they believe that they would have to disclose the barrment on a new gaming license application, they can only speculate about the consequences of having to disclose the barrment since they have

not completed any gaming license application since being barred. *See* Statement of Facts ¶ 95; App. 18 (M. Hoeger Dep. I, 127:19-128-2). In other words, they have no evidence of any negative experience from any duty to disclose the barrment. *See* Statement of Facts ¶ 101-103, 106, 110.

They also admit that the consequences of a disclosed barrment in a gaming license application are, at best unclear, since, for example, the IRGC license application provides an applicant the opportunity to explain any barrment. *See* Statement of Facts ¶ 89. The Hoegers cannot point to any rule or policy that automatically disqualifies an applicant from obtaining a gaming license following a barrment. *See* Statement of Facts ¶ 91; App 56 (R. Hoeger Dep. 73:4-7); App. 57 (R. Hoeger Dep. 80:2-81:12). At most, they speculate about their belief in the consequences of disclosing a barrment in a gaming license application. Their speculation is insufficient to withstand summary judgment. "To survive a motion for summary judgment, the nonmoving party must 'substantiate [his or her] allegations with sufficient probative evidence that would permit a finding in [his or her] favor based on more than mere speculation, conjecture, or fantasy.'" *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)).

And, the Hoegers failed to identify any prospective employer or entity that took a negative view of them because of the issuance of the barrment letter. *See* Statement of Facts ¶ 80-82, 85. In fact, the Hoegers testified that they have never disclosed their barrments to any prospective employer and have no knowledge of anyone else having disclosed their barrments to a prospective employer. *See* Statement of Facts ¶ 80-86. The

Hoegers have obtained new employment and did so without disclosing their barrments. *See* Statement of Facts ¶ 111; App. 23 (M. Hoeger Dep. II, 11:6-11).

The most the Hoegers can do is assume that because Mystique had issued the barrment letter, someone somewhere had changed their opinion of them, pointing to Mystique employees' propensity to gossip. *See* Statement of Facts ¶ 86. Mary also believes that having been barred from Mystique would "cast a shadow over whether I am responsible enough to be in a human resource position," but agrees that "somebody would have to know about the barrment in order for it to cast a shadow." *See* Statement of Facts ¶ 104. Roger testified to his belief that he will now be unable to obtain a "higher level position in the gaming industry" because of the barrment, but admits that he has not tried to obtain a "higher level position" in the gaming industry since the barrment issued. *See* Statement of Facts ¶ 110.

This type of rank speculation and conjecture is insufficient to defeat summary judgment. *See Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) ("'Evidence, not contentions, avoids summary judgment.'" quoting *Mayer v. Nextel West Corp.*, F.3d 803, 809 (8th Cir. 2003)). Without some evidence of damage to their reputation, the Hoegers' defamation claims fail. *See Kiesau*, 686 N.W.2d at 175; *see also Bierman*, 826 N.W.2d at 463 (stating that a plaintiff's "speculat[ion] that some people of whom she is not aware might have" been aware of the alleged defamatory statement was insufficient to prove defamation under Iowa law).

To be sure, the Hoegers' personal feelings were hurt by Mystique's issuance of the barrment letters. But, "'[h]urt feelings alone cannot serve as the basis of a defamation action.'" *Bierman*, 826 N.W.2d at 447 (quoting *Johnson v. Nickerson*, 542 N.W.2d 506,

7

513 (Iowa 1996)). Rather, "[t]here must be proof of 'reputational harm.'" *Id.* at 447

(quoting *Schlegel*, 585 N.W.2d at 224). When a record is "devoid of evidence that anyone

changed his or her opinion of [a plaintiff] after reading" the alleged defamatory statement,

it's appropriate to enter summary judgment for the defendant for a libel per quod

defamation claim. *Id.* Merely suffering "mental anguish" because of a publicized

statement is insufficient. *Id.* Absent any evidence of a change in reputation following the

issuance of the barrment letters, Mystique is entitled to summary judgment on the Hoegers'

defamation claims as a matter of law. *See id.*

> **b. The Hoegers cannot evade the requisite proof of reputational damage by characterizing the barrment letters as defamation per se.**

In an effort to avoid dismissal of their defamation claims, the Hoegers will likely

attempt to characterize the barrment letters as libel per se rather than libel per quod. The

difference between libel per se and libel per quod claims is essentially one of degree: was

the statement "so defamatory that [it] amounted to libel per se." *Bierman*, 826 N.W.2d at

464. A libel per quod claim consists of the following prima facie elements: (1) publication

of a statement that; (2) was defamatory; (3) of and concerning the plaintiff, and (4) resulted

in injury to the plaintiff. *Doe v. Hagar*, 765 F.3d at 855, 860 (8th Cir. 2014) (citing

*Kiesau,* 686 N.W.2d at 175 (Iowa 2004); *Johnson,* 542 N.W.2d at 510 (internal quotation

marks omitted)). In contrast, libel per se claims arise when the alleged defamatory

statement has "'a natural tendency to provoke the plaintiff to wrath or expose him to public

hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social

intercourse.'" *Hagar*, 765 F.3d at 861 (quoting *Johnson,* 542 N.W.2d at 510).

Statements that qualify as libel per se are presumed to be defamatory as a matter of law. *Hagar*, 765 F.3d at 861. (citing 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* 2–112 to –113 (4th ed. 2012) (stating that the communications giving rise to libel per se "should be referred to as 'defamatory as a matter of law'"). Libel per se claims do not require proof of falsity, malice, and injury to reputation. *Id.* at 861 (citing *Kiesau,* 686 N.W.2d at 175). Thus, in order to maintain an action for libel per se, the Hoegers would have the burden of proving that Mystique (1) published a statement that was (2) defamatory as a matter of law and (3) was of and concerning the Hoegers. *See id.* (citing *Bierman*, 826 N.W.2d at 464 (Iowa 2013)). "'If a statement is clear and unambiguous, the issue of whether the statement is defamatory as a matter of law is for the court.'" *Hagar*, 765 F.3d at 862 (quoting *Kiseau*, 686 N.W.2d at 175). "[D]etermining whether a potentially libelous statement is libel 'per se' is strictly a matter of law which affects the elements that a plaintiff must prove to prevail." *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 294 (Iowa 1985).

The barrment letters stated the Hoegers' "actions give reason[] to believe that [their] continued presence could hinder the efficient and expedient methodology of conducting gaming business and operations." *See* Statement of Facts ¶ 70; App. 52 (R. Hoeger Dep. 59:16-60:6). While the Hoegers take offense to the language in the barrment letter and the barrment itself, as a matter of law, those statements do not have "'a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.'" *Hagar*, 765 F.3d at 861 (quoting *Johnson*, 542 N.W.2d at 510). Instead, the barrment letters merely indicate the writer's belief that some potential action by the Hoegers *could*—

not *had*—hinder the efficient and expedient methodology of conducting gaming and business operations at Mystique.  There's no reasonable basis to conclude that this innocuous statement could rouse a third party to conclude that the Hoegers had actually engaged in any kind of objectionable activity that would meet the demanding libel per se standard.

Review of case law demonstrates that the barment letters contain language that falls far short of the type of statement that *would* qualify as libel per se.  For example, "[a]ccusations of indictable crimes of moral turpitude are libel per se."  *Bierman*, 826 N.W.2d at 464; *see also Hagar*, 765 F.3d at 862 (stating that accusing someone of extortion, which is a criminal charge involving both a crime of moral turpitude and a potential prison sentence, was libel per se).  To meet the libel per se standard, "[t]he crime must either involve moral turpitude or subject the person accused to a sentence of incarceration."  *Huegerich*, 547 N.W.2d at 221.  The barment letters do not accuse the Hoegers of any crime, much less a crime of moral turpitude or one that subjects the person to incarceration.  At most, the barment letters state that the Hoegers could be prosecuted for trespass if they returned to the premises—the barment letters do not state that the Hoegers had in fact criminally trespassed on Mystique's property.  *See* App. 93, 95 (M. Hoeger Dep. Ex. 3, R. Hoeger Dep. Ex 5).

Similarly, an accusation of "immorality or dishonesty," which also qualifies as libel per se in Iowa, is absent from the barment letters.  *Bierman*, 826 N.W.2d at 464 (citing *Kiesau*, 686 N.W.2d at 178).  An accusation of immorality or dishonesty would include calling a plaintiff a liar.  *Schlegel*, 585 N.W.2d at 222; *see also Hagar*, 765 F.3d at 862 (implication that the plaintiff may have lied about being pregnant and giving birth to her

Case 2:14-cv-01029-JSS   Document 19-1   Filed 10/30/15   Page 10 of 23

son was libel per se).  It could also include an implication that a plaintiff is "a cheater[] or thief."  *Spencer v. Spencer*, 479 N.W.2d 293, 296 (Iowa 1991).  Again, no accusation of dishonesty appears in or is implied by the barrment letters.

Libel per se could also include a statement that impugns a plaintiff's chastity, such as "a doctored image of plaintiff appearing topless" or engaging in "sexual exploits." *Bierman*, 826 N.W.2d at 464 (citation omitted); *Hagar*, 765 F.3d at 862 (citations omitted). The barrment letters don't contain this language.

Another category of libel per se is accusations or implications that charge a plaintiff with "business incompetence or lack of skill."  *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d at 288, 295 (Iowa Ct. App. 1985) (citing *Vojak v. Jensen*, 161 N.W.2d 103, 104 (Iowa 1968)).  To qualify as libel per se on this basis requires language that would lead a reader to question the plaintiff's skills or competence.  *See, e.g.*, *Kelly*, 372 N.W.2d at 293, 295-96 (statement that the plaintiff had "terminated all of his special education consultants in an effort, some think, to eliminate his chief negotiators and other Association leaders" was potentially libelous per se because it implied that he had acted inappropriately in his professional capacity).  A statement that a person "was unable to do business with [a plaintiff] 'on a handshake'" falls short of a charge of libel per se based on incompetence or lack of skill.  *Galloway v. Zuckert*, 447 N.W.2d 553, 554-555 (Iowa Ct. App. 1989); s*ee also Miller v. Jackson*, No. LACV128134, 2004 WL 3568707, at **1-2 (Iowa Dist. Ct. Woodbury Cnty. June 4, 2004) (letter that a consumer sent to the Iowa Attorney General's Office and other public agencies about a contractor that "question[ed the] integrity as a legitimate contractor" and alleged that the contractor had threatened and harassed the writer's wife was potentially libelous per se).

Again, the barrment letters contain no accusation or implication that challenged the Hoegers' business or professional skills. Indeed, any reference to the Hoegers' business competence and skills are wholly absent from the barrment letters. And, their professional competence or skills were no longer an issue because their employment had been severed at the time the barrment were letters issued. *See* Statement of Facts ¶ 73, 81, 85, 99-112.

In short, there is nothing about the barrment letters that has "a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Hagar*, 765 F.3d at 861. A federal court in New Jersey reached the same conclusion when considering a plaintiff's exclusion from a casino due to alleged card counting. *See Hoagburg v. Harrah's Marina Hotel Casino*, 585 F. Supp. 1167, 1170 (D.N.J. 1984) (casino's exclusion of plaintiff for "card counting" was not libel per se). A similar result is appropriate under Iowa law. For this reason, the Hoegers cannot proceed under a libel per se claim and must prove each element of their defamation claim.

> **2. Because the statements in the barrment letters were substantially true, the Hoegers' defamation claims fail.**

Substantial truth is a defense to defamation. *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987). "Generally, the statements must be false and demonstrably about the person claiming to be defamed." *Huegerich*, 547 N.W.2d at 221 (citation omitted) (citing Restatement (Second) of Torts § 558 (1977)). "The truth of the statement is an absolute defense." *Id.* (citing *Jones v. Palmer Commc'ns,* 440 N.W.2d 884, 891 (Iowa 1989); 50 Am.Jur.2d *Libel & Slander* § 268 (1995); Restatement (Second) of Torts § 581A). To evaluate the accuracy of an allegation, courts evaluate the statement's "gist" or

"sting." *Behr,* 414 N.W.2d at 342. The accuracy of the details doesn't matter so long as the gist is true. *Id.*

The substantial truthfulness of the gist or sting of the statements in the barrment letter is this: that the Hoegers' actions gave Mystique "reason[] to believe" that if the Hoegers returned to Mystique's property, their presence on the property could (not would) cause the casino operations to be less efficient and expedient. App. 93, 95 (M. Hoeger Dep. Ex. 3), (R. Hoeger Dep. Ex. 5). The conditional phrasing of the alleged defamatory statement cannot be ignored. *See Shaw v. Buser*, No. 08-1060, 2009 WL 1066777, at *8 (Iowa Ct. App. Apr. 22, 2009) (evidence that someone "may have" said that materials were stolen was found to be substantially true and not defamatory). In this case, the alleged defamatory statement includes similar conditional phrasing—that the Hoegers' actions led Mystique's representatives to believe that gaming operations "could" be interfered with if the Hoegers returned to the casino. In other words, there is no statement that the Hoegers had actually interfered with casino operations.

And, there's no dispute that Mystique's President and CEO, Jesus Aviles, held a sincere belief in the truth of the barrment statements when he directed their issuance. *See* Statement of Facts ¶ 51-64. The reason for his belief was based on a host of facts about the Hoegers' previous behavior at Mystique, which were disclosed to him through the independent investigation. The investigation led Aviles to believe there were numerous employees who demonstrated the Hoegers engaged in a "pattern of vindictiveness," including reprimanding or going after employees with whom either Roger or Mary were upset. *See* Statement of Facts ¶ 28-29, 61.

Case 2:14-cv-01029-JSS   Document 19-1   Filed 10/30/15   Page 13 of 23

Aviles also had reason to believe the truthfulness of this statement due to the fears recently expressed to him by his current employees following the Hoegers' separation from employment. *See* Statement of Facts ¶ 33, 46-48. Aviles understood that two employees, Anderson and Brandt, were frightened about working at Mystique because they were concerned Mary or Roger would enter the premises. *See* Statement of Facts ¶ 50-51. Anderson and Brandt worked in the administrative suite and were closely tied to the operations of the casino. *See* Statement of Facts ¶ 60. Anderson and Brandt's absence from work due to fear of retaliation by Mary and Roger would necessarily interfere with the operations of the casino. *See* Statement of Facts ¶ 63. Aviles had no reason to doubt that the fear of his employees was legitimate. *See* Statement of Facts ¶ 33, 53-54. Aviles believed that if the Hoegers had returned to the casino, their presence *could* have negatively affected Brandt and Anderson's ability to perform the essential functions of their jobs, thereby hindering the efficient operations of the casino. *See* Statement of Facts ¶ 50-51.

Therefore, the gist of the statement—that the Hoegers had taken actions that gave Mystique reason to believe their presence could cause gaming operations to be less efficient and experience—was substantially true. This defeats the Hoegers' defamation claims. *See Behr,* 414 N.W.2d at 342.

The Hoegers will likely dispute that the fears expressed by Anderson and Brandt to the investigator were genuine or reasonable. But this isn't material to the question of the statement's truthfulness. What matters is whether the gist of the statement in the barrment letters was true—whether the Hoegers' actions had given Aviles reason to believe that their presence on casino property would interfere with casino operations. The undisputed facts

14

demonstrate Aviles's genuine belief that the Hoegers' actions *could* interfere with the casino's operations. *See Behr*, 414 N.W.2d at 342. This is sufficient to defeat the Hoegers' defamation claims.

>    3.    **The statutory privilege that gives gaming operations the right to bar individuals "for any reason" gives Mystique qualified immunity to the Hoegers' claims.**

A third independent basis defeats the Hoegers' defamation claim: Mystique is immune from liability due to qualified privilege. "The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication." *Vojak*, 161 N.W.2d at 105 (Iowa 1968) (abrogated on other grounds by *Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004)). "Qualified privilege attaches to communications made (1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation in the subject matter of the communication." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 803 (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)). This privilege applies here.

The first element of qualified privilege is satisfied because the undisputed facts show that Mystique made the statements in "good faith" at the direction of Aviles due to the employee fears expressed above. *See Taggart*, 549 N.W.2d at 803. Without resorting to speculation, the Hoegers simply cannot attack Aviles's contention that he acted in good faith in issuing the barment letters. Mystique had a right and duty under Iowa law to make and communicate the alleged defamatory statements in the barment letters.

The second element of qualified privilege—that the statement concerned subject matter in which the speaker has an interest—is also satisfied. *Taggart*, 549 N.W.2d at 803. State-licensed casinos are expressly permitted by state law to "eject or exclude any person, licensed or unlicensed, from the premises or a part thereof of the licensee's facility, solely of the licensee's own volition and without any reason or excuse given" as long as the exclusion is not based on a protected characteristic. Iowa Admin. Code r. 491-5.4(5)(d). There is neither an allegation or any evidence that their barrments were somehow based on any protected characteristic, such as their race, color, or religion, and, in fact, Roger admits this fact. *See* Statement of Facts ¶ 74. The Hoegers also concede that Mystique was legally permitted to eject or exclude them from its premises "without any reason given." *See* Statement of Facts ¶ 75-76. In other words, the Hoegers admit the basis for application of the qualified privilege.

And, the third element—that the listener has a corresponding interest, right, duty, or obligation in the subject matter of the communication—is also satisfied. *See Taggart*, 549 N.W.2d at 803. State law requires casino to "promptly" make reports of any and all exclusions "for any reason" to the IRGC and DCI. Iowa Admin Code r. 491-5.4(5)(d). The circumstances of the exclusion must be reported to DCI and IRGC, and the name of the excluded person must also be reported if the exclusion is for more than one day. *Id*. And, to effectuate the barrment, Mystique had to notify the requisite internal departments, including Mystique's Director of Security's supervisors, security personnel and surveillance. *See* Statement of Facts ¶ 72.

Based on these facts and the Iowa law that authorizes the very conduct the Hoegers challenge, qualified privilege applies and is an affirmative defense to the Hoegers'

defamation claims. *See Taggart*, 549 N.W.2d at 803. Courts in other jurisdictions have reached similar conclusions. *See Dockery v. Sam's Town Casino*, No. 06-1293, 2007 WL 3023928, at *4 (W.D. La. Oct. 12, 2007) (dismissing plaintiff's claim against casino based on exclusion because of statutory privilege that gave the casino the right to lawfully eject any person).

> **B. The Hoegers' breach of contract claims fail because they cannot prove Mystique breached the separation agreements and cannot prove any damages.**

To prevail on their breach of contract claims, the Hoegers must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that they performed all the terms and conditions of the contract; and (4) the defendant breached the contract in some particular way; and (5) the plaintiff suffered damages as a result of the breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). The Hoegers allege that Mystique breached the anti-disparagement provision of the severance agreements when it issued the barment letters. The operative excerpt of the anti-disparagement provisions states: "Similarly, Employer and its representatives will not make any disparaging comments regarding Employee that are otherwise detrimental to [his/her] reputation." *See* Statement of Facts ¶ 42-43.

> **1. The barment letters are not "disparaging" comments or otherwise detrimental to the Hoegers' reputation.**

The Hoegers can't prove that Mystique breached the separation agreements because the barment letters did not disparage the Hoegers and were not otherwise detrimental to their reputation. The separation agreements do not define "disparaging" or "detrimental to [his/her] reputation." *See* Statement of Facts ¶ 42-43. The separation agreements are

Case 2:14-cv-01029-JSS   Document 19-1   Filed 10/30/15   Page 17 of 23

governed by Iowa law. App. 100, 104. In Iowa, "[t]he basic rule in construing written contracts is the intent of the parties controls." *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa Ct. App. 1994) (citing *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 862 (Iowa 1991)). "This intent is determined by the language in the contract, unless it is ambiguous." *Id.* If the words in the contract are unambiguous, they "are given their plain and ordinary meaning." *Id.* (citing *Pappas v. Bever,* 219 N.W.2d 720, 721 (Iowa 1974)).

The Iowa Supreme Court has already provided guidance on the plain and ordinary meaning of "disparage." *See Ottumwa Hous. Auth. v. State Farm Fire & Cas. Co.*, 495 N.W.2d 723, 728 (Iowa 1993). That guidance is helpful here. In *Ottumwa Housing*, the Iowa Supreme Court has discussed the meaning of "disparaging" in a case that interpreted an insurance policy. *Id.* There, the Court turned to the dictionary meaning of "disparage" and held:

> "Disparage" means, among other things, "to lower in esteem or reputation," "[to] lower in rank by action or words," "to speak slightingly of," or to "run down." Webster's Third New International Dictionary 653 (P. Gove ed.1965). With these definitions in mind, we think a reasonable person would understand the term "disparaging" in the policy to cover remarks meant to destroy or impair one's reputation. Several other jurisdictions construing the same policy language have come to this conclusion. *See American & Foreign Ins. Co. v. Church Schs. in the Diocese,* 645 F. Supp. 628, 633 (E.D.Va.1986) (policy language required allegation in underlying suit of false statement under traditional defamation torts); *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.,* 406 Mass. 7, 12, 545 N.E.2d 1156, 1158-59 (1989) (third-party complaint found "reasonably susceptible" of stating a covered claim when gist of allegation was insured "somehow spoke slightingly about [the third party] and damaged [the third party's] reputation"); *Hamlin v. Western Nat'l Mut. Ins. Co.,* 461 N.W.2d 395, 398

(Minn.App.1990) (policy language "limit[ed] coverage to damages 'arising out of' defamation-type torts"); *Nichols v. American Employers Ins. Co.,* 140 Wis.2d 743, 748-50, 412 N.W.2d 547, 550 (1987) (policy language "contemplat[es] defense of defamation suits, not suits claiming damages where a defamatory statement may be involved").

*Id.*

With the Iowa Supreme Court's definition of "disparage" in mind, it's clear that the Hoegers cannot prove that Mystique breached the anti-disparagement clause of the severance agreements when it issued the barrment letters. As discussed above, the Hoegers have no evidence that shows the barrment letters lowered their esteem or reputation or destroyed or impaired their reputations. They resort to speculation, contending that the barrment letter was "not a positive," so it must be disparaging. App. 54 (R. Hoeger 67:3-7); App. 16, 17 (M. Hoeger I, 102:9-103:7); App. <> (M. Hoeger II, 87:10-18). But that's not the law. Something more is needed to prove breach here—that the barrment letters operated to "destroy or impair" the Hoeger's reputation. *Ottumwa Housing*, 495 N.W.2d at 728. Because the Hoegers cannot prove the barrment letters disparaged them, they cannot prove the fourth element of their breach of contract claim.

### 2. Absent proof of damages, the Hoegers cannot prevail on a breach of contract claim.

The Hoegers' breach of contract claims also fail on the fifth element—that they suffered damages as a result of the alleged breach. *See Royal Indem.*, 786 N.W.2d at 846. As discussed in depth above, the Hoegers have been unable to identify any measurable damage or loss to them as a result of the barrment letters. And, the Hoegers admit that Mystique has paid them everything they were due under the severance agreements. *See* Statement of Facts ¶ 45. The most the Hoegers do is assume that they experienced

damages as a result of the barrment letters because they believe the barrment letters were negative. But this is insufficient. In a breach of contract claim, "if it is speculative and uncertain whether damages have been sustained, recovery is denied." *Orkin Exterminating Co. Inc. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968). Summary judgment is appropriate on the Hoegers' breach of contract claim.

### C. The Hoegers' intentional infliction of emotional distress claims fail because issuing lawful barrment letters is not outrageous conduct under Iowa law.

To prevail on a claim for intentional infliction of emotional distress, "a plaintiff must demonstrate four elements: (1) outrageous conduct by the defendant; (2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress; (3) the plaintiff has suffered severe or extreme emotional distress; and (4) actual proximate causation of the emotional distress by the defendant's outrageous conduct." *Taggart*, 549 N.W.2d at 802 (citation omitted). The Hoegers cannot meet their burden on the first element. Summary judgment is appropriate on this claim.

The Hoegers cannot prove that the issuance of the barrment letter qualifies as "outrageous" conduct, or that it is "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community?" *Dickerson v. Mertz*, 547 N.W.2d 208, 214 (Iowa 1996) (quoting *Marks v. Estate of Hartgerink*, 528 N.W.2d 539, 546 (Iowa 1995)). "The controlling question here, under the first element, is whether the alleged conduct could reasonably be regarded as outrageous. To qualify, the conduct must be extremely egregious; mere insult, bad manners, or hurt feelings are insufficient." *Taggart,* 549 N.W.2d at 802 (citing Restatement (Second) of Torts § 46 cmt. d (1965)).

The outrageousness element requires "substantial evidence of extreme conduct," and it is not enough that a defendant acted with a tortious or even criminal intent. *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984). "It is for the court to initially decide whether defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Dickerson*, 547 N.W.2d at 214.

Mystique's issuance of a permanent exclusion from a state-licensed casino for a six-day period is not outrageous conduct and insufficient to state a claim for intentional infliction of emotional distress as a matter of law. The Hoegers admit Mystique was allowed to issue a barment for any reason at all under Iowa Administrative Code rule 491-5.4(5)(d). *See* Statement of Facts ¶ 75-76. They admit Mystique rescinded the barment letters when they requested them to do so. *See* Statement of Facts ¶ 78.

Review of similar facts in other Iowa cases reveals that Mystique's conduct in this case does not qualify as "outrageous." In *Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991), the Iowa Supreme Court held that a law firm's letter advising a partner who had suffered from a period of mental illness that he could not return to law practice without further review by partners was not extremely outrageous and did not generate a genuine issue of material fact on the claim. Mystique's conduct here— excluding the Hoegers from returning to the casino—is similar and not outrageous. *Reihmann v. Foerstner,* 375 N.W.2d 677, 681 (Iowa 1985) dealt with an employment issue and held that an employer's alleged improper influence to transfer an employee after complaints from customers was not outrageous. Here, its undisputed there were co-worker concerns about the Hoegers that led to the issuance of the barment letters.

Case 2:14-cv-01029-JSS   Document 19-1   Filed 10/30/15   Page 21 of 23

Even if the Court chose to characterize Mystique's issuance of the barrment letter as wrong or retaliatory, that wouldn't be enough to reach the "outrageous" threshold. In *Vinson*, an allegedly deliberate campaign to badger and harass an employee was found not to be outrageous although "petty and wrong, even malicious." 360 N.W.2d at 119. A similar result would be appropriate here.

There is no legal basis to find that Mystique's issuance of the barrment letters in this case constitutes conduct so extreme that it can be characterized as "atrocious" and "utterly intolerable" in a civilized community." *Dickerson*, 547 N.W.2d at 214. Summary judgment is appropriate on this claim.

/s/ Mitchell Kunert
/s/ Frances M. Haas
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309
Telephone: 515-283-3100
Facsimile: 515-283-8045
Email: mrkunert@nyemaster.com
Email: fmhaas@nyemaster.com
ATTORNEYS FOR DEFENDANT.

**Certificate of service**

       I hereby certify that on October 30, 2015, I presented the foregoing document to the Clerk of the Court for filing and uploading into the ECF system, which will send notification to the following ECF system participants:

Natalia H. Blaskovich
REYNOLDS & KENLINE, L.L.P.
110 East 9th Street
P.O. Box 239
Dubuque, IA 52004-0239
TEL: (563) 556-8000
FAX: (563) 556-8009
Email: blaskovich@rkenline.com
Attorney for Plaintiff

Emilie J. Roth Richardson
ROTH LAW OFFICE, P.C.
1400 University Ave., Suite D
Dubuque, IA 52001
Tel: 563-557-1611
Fax: 563-557-9775
Email: eroth@rothlawdbq.com
Attorney for Plaintiff

                                /s/ Mitchell R. Kunert